IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville May 17, 2017

## STATE OF TENNESSEE v. SEAN FARRIS

**Appeal from the Criminal Court for Shelby County**
No. 15-01058        J. Robert Carter, Jr., Judge

————————————————————

## No. W2016-01778-CCA-R3-CD

————————————————————

A jury convicted the Defendant, Sean Farris, of aggravated robbery, and the trial court sentenced the Defendant to serve ten years and six months in the Tennessee Department of Correction. On appeal, the Defendant asserts that: (1) the trial court improperly allowed the admission of prior convictions; (2) the trial court unreasonably limited cross-examination of the victim; (3) the evidence is insufficient to sustain his conviction; and (4) his sentence is excessive. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

John R. Holton, Memphis, Tennessee, for the appellant, Sean Farris.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Amy P. Weirich, District Attorney General; Dru Carpenter and Gavin Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case arises from the victim being held at gunpoint and robbed of his keys, laptop, and wallet. A Shelby County grand jury indicted the Defendant and his co-defendant, Darryl Goodman, for aggravated robbery. At a trial on the charges, the parties presented the following evidence: The victim testified that on August 30, 2014, he lived at the Grahamwood Apartments on Summer Avenue in Memphis, Tennessee. On that date, the victim arrived home from church with his wife and daughter after dark, between 7:30 and 8:00 p.m. He parked his red Ford Expedition next to a light brown or cream-colored Chevrolet Avalanche that was facing the street. The victim noticed that there

were three people inside the vehicle: one in the front passenger seat and two in the back seat. He recalled that there were also some men standing outside of the Chevrolet Avalanche.

The victim testified that, after parking his truck, he and his wife and daughter, exited his truck, and walked toward their apartment. As he was walking to his apartment, one of the men that had been seated in the back seat of the Avalanche approached him and began asking questions about the apartment complex office. The victim turned toward the man and saw him pull a black semi-automatic gun from his waistband and point it at the victim. The man demanded the victim's laptop, wallet, and keys. The victim described the key chain holding his keys as having a red heart and a hat on the key ring. The victim testified that he was scared as he handed the items over to the man. He said that, after he turned over the items, the man ordered him to "get out." The victim began walking away and, when he looked back over his shoulder, he saw the man getting into the Avalanche.

The victim testified that he went to his apartment and asked his wife to call the police. When the police arrived, he described the Avalanche and events of the evening to the police. Later, he met with detectives at the police station and identified the Defendant from a photographic lineup. The victim stated that he saw the Avalanche at his apartment complex again three days after the robbery on September 2, 2014, at 9:30 or 10:00 a.m. The victim confirmed that Detective Perea returned his keys to him. He agreed that none of the other stolen items were returned and noted that he had both United States currency and Mexican currency in his wallet at the time it was stolen.

The victim identified the Defendant in court as the man that had pointed the gun at him and taken his items. The victim stated that the Defendant's hair was longer at the time of trial than it had been at the time of the offense.

Kory Payne, a Memphis Police Department ("MPD") officer, testified that he responded to a report of a robbery on August 30, 2014, at Grahamwood Apartments. He met with the victim, who spoke Spanish. The victim's wife translated for the victim. Officer Payne described the victim's demeanor as "very upset, disoriented," and "extremely bothered." The victim, through his wife, described the vehicle he had seen the perpetrator leave in, a "tannish-gray" Chevy Avalanche, and Officer Kayne relayed the description to other officers via police radio.

Malcolm Smith, an MPD police officer, testified that, on September 2, 2014, he located a vehicle matching the description provided by the victim. The vehicle was backed into a driveway of a residence located on Breedlove Street. As Officer Smith observed the vehicle, three individuals exited the residence and got into the vehicle. The

police later stopped the vehicle and took all three individuals into custody. One of the individuals, the driver, was the co-defendant in this case.

Sam Blue, an MPD officer, testified that on September 2, 2014, he searched the Avalanche associated with this case. While doing so, Officer Blue found a .380 caliber handgun under the right rear passenger seat of the vehicle and a .22 caliber revolver on the right side of the driver's seat between the console and "the floor of the driver's seat."

Jason Gallardo, a former MPD officer,[1] testified that, on September 28, 2014, he responded to a call about a "suspicious person" at Macon Pointe Apartments in Memphis, Tennessee. He spoke with a man who provided a false name. Upon further investigation, Officer Gallardo confirmed that the man was the Defendant and learned that there was a warrant for the Defendant's arrest for an aggravated robbery. While detaining the Defendant, Officer Gallardo found Mexican currency in the Defendant's possession. Officer Gallardo stated that the currency held no significance to him at the time, so he returned the currency to the Defendant. Later, during transport of the Defendant, Officer Gallardo was unable to find the Mexican currency on the Defendant.

David Payment, an MPD officer, testified that, on September 2, 2014, he reported to a residence on Breedlove Street with a metal detector to look for evidence in the area surrounding the residence. When he arrived, the owner was outside and gave consent for Officer Payment to search the backyard of the residence located next door to the residence where the Avalanche had been located. During the search, Officer Payment found a set of keys with "a silver colored hat and a red tag" located approximately ten feet from the fence separating the two properties.

Jesus Perea, an MPD detective, testified that, in August 2014, he investigated the aggravated robbery at the Grahamwood Apartments. On September 15, 2014, Detective Perea spoke with the victim and showed him a photographic line-up containing the Defendant's photograph. The victim pointed out, circled, initialed and then signed the booking photo of the Defendant.

Detective Perea testified that, during the course of the investigation, he became aware of information that indicated there might have been "some sort of evidence" disposed of near a residence on Breedlove Street. The owner was the co-defendant's sister, Courtney Amos. Ms. Amos provided verbal and written consent to search around her residence. Officers also obtained permission from adjacent properties to search the

---

[1] Officer Gallardo testified that, at the time of trial, he was employed with the Austin, Texas police department.

- 3 -

backyards. The victim's keys, which were taken during the aggravated robbery, were recovered in the back yard next to Ms. Amos's property.

The Defendant testified that, on August 30, 2014, he was a passenger in his co-defendant's vehicle. He had agreed to give his co-defendant "gas money" for a ride home. The Defendant estimated that it was around 8:00 p.m. when he got into the Avalanche. At the time, Alicia Parker was driving the Avalanche, the co-defendant was seated in the front passenger seat, and "Tay-Tay" was seated with the Defendant in the backseat. Ms. Parker drove the Avalanche down the street to a Texaco gas station and got gas. After getting the gas, the Defendant believed he would be taken home but, instead, the co-defendant told the Defendant that he was going to make a "little stop" to get marijuana first. The group drove to an apartment complex "right off" Summer Avenue. Ms. Parker backed the Avalanche into a parking space, and the co-defendant and "Tay-Tay" exited the vehicle.

The Defendant testified that he spoke with Ms. Parker while waiting for the co-defendant to return. About ten minutes later, the co-defendant and "Tay-Tay" returned and got back into the Avalanche. The Defendant then observed a red Expedition pull into the parking space next to the Avalanche. The co-defendant stated that "the man" did not answer the door and instructed Ms. Parker to call "the man." As he sat there, the Defendant noticed a woman and children get out of the Expedition and walk toward an apartment building while a man remained seated in the Expedition. The Defendant recalled that the co-defendant then finished his phone call and said he was going to go back and knock on the door. The co-defendant exited the Avalanche and the victim, who had been seated in the Expedition, walked toward an apartment building. The two men were in close proximity to one another and began talking.

The Defendant testified that the co-defendant raised his right arm, and the victim handed the co-defendant a black bag. The Defendant said that he did not see a gun but that he could clearly see the co-defendant's arm extended. The co-defendant then ran back to the Avalanche with a black bag in one hand and a white revolver in the other. The Defendant said that he was "hysterical" and that he began cursing and yelling at the co-defendant. The two exchanged words and when Ms. Parker had driven a short way down the road away from the apartments, the Defendant demanded that he be let out of the Avalanche. Ms. Parker complied, and the Defendant walked to a hotel where he stayed for the night

The Defendant testified that at the time of this offense he weighed approximately twenty pounds less than he did at trial.

On cross-examination, the Defendant confirmed that in 2010, he was convicted of five counts of burglary of a motor vehicle and one count of theft over $1000. He further confirmed that he had a 2014 conviction for criminal impersonation.

After hearing the evidence, the jury convicted the Defendant of aggravated robbery. At a subsequent sentencing hearing, the State submitted a victim impact statement addressing the fear and broken security that the victim and his family now felt following the aggravated robbery. The Defendant made a statement in allocution apologizing to the victim and asking the court to consider the programs he has completed while in incarceration. He asked to be sentenced to Community Corrections.

The trial court stated that the Defendant was convicted of a Class B felony and was a Range I, standard offender with a sentencing range of eight to twelve years. In determining a sentence, the trial court made the following findings:

> I do find enhancement number one is a very important factor. [The Defendant] has a significant criminal history over and above that necessary to make him range one. And like I said, in fact, he's got a variety of felony [and] misdemeanor charges that I have to give great weight to. Enhancement factor two that he was the leader in the commission of an offense involving two or more actors, I'm not sure after hearing the proof whether I think [the Defendant] was the leade[r] or whether [the co-defendant] was the leader, or whether it was a joint adventure. . . . So, I'm not accrediting that factor. . . . [T]he State recommends number 17 which is basically a hate crime allegation. And I do find - - I think I can look at the entire record in this case and see that [the Defendant] is charged with his codefendants with targeting a specific group and frankly, they were Hispanics. And my honest feeling on this is that these people were targeted not because they were Hispanic, per se, not because of some prejudice against that nationality, but because of the practicality of the language difficulty and the citizenship issues that many of the people in that community face makes them particularly vulnerable. . . . [S]o I do give that some weight, but not the same weight that I would give in the weight of racially, or religiously, or sexual orientation motivated crimes. . . . In looking at the mitigation, I'm recalling the testimony of [the Defendant] at the trial in which he basically did not accept any responsibility and blamed [the co-defendant] for the entire matter. I think, if I remember correctly he said it was the worst night of his life . . . . Today in his allocution he seems to accept a bit more responsibility asking for his apology [to] be conveyed to the victim and to the extent that I don't know how much affect that is, I have to give him some credit. He didn't have to say it but he did, so I do. . .

. I think we may have heard he has attended some classes. . . . So, I have to give some credit for the fact somebody would use their time wisely and while they're in custody. . . . And so while his criminal history would scream for me to give him the maximum, I'm not going to do that. I'm going to hope that he's honest when he says he hopes to do a rehabilitation and I'm going to sentence him to 10 years and six months.

It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court improperly allowed the admission of prior convictions; (2) the trial court unreasonably limited cross-examination of the victim; (3) the evidence is insufficient to sustain his conviction; and (4) his sentence is excessive.

## A. Admission of Prior Convictions

The Defendant contends that the trial court erred when it allowed the State to use for impeachment purposes the Defendant's prior convictions for attempt to alter a license tag and for theft under five hundred dollars. The State contends that the trial court properly allowed the Defendant's prior convictions into evidence for impeachment purposes. We agree with the State.

Tennessee Rule of Evidence 609(a) provides that a witness may be impeached by evidence of a prior conviction. However, the prior conviction must be a felony conviction or a conviction of an offense involving dishonesty or a false statement. Tenn. R. Evid. 609(a)(2). Upon request, the trial court must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. *Id*. The rule also mandates that the State give reasonable written notice prior to trial of the particular convictions it intends to use to impeach the accused. Tenn. R. Evid. 609(a)(3). The Tennessee Supreme Court has noted that the following two criteria are especially relevant in balancing a prior conviction's probative value and unfair prejudicial effect: (1) the impeaching conviction's relevance as to credibility; and (2) the impeaching conviction's similarity to the charged offense. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003).

When an impeaching conviction is substantially similar to the charged offense, a danger exists that jurors will improperly consider the impeaching conviction as evidence of the propensity of the defendant to commit the crime. *Id*. Accordingly, the unfair prejudicial effect of an impeaching conviction on the substantive issues greatly increases

if the conviction is substantially similar to the charged offense. *Id*. Under these circumstances, a trial court should carefully balance the impeaching conviction's relevance with regard to credibility against its unfair prejudicial effect on substantive issues. *Id*.

Evidence of a prior conviction that is substantially similar to the charged offense is not, however, per se inadmissible for impeachment purposes. *Id*. "The standard is not whether there is any prejudice by allowing the State to use the prior conviction for impeachment, but whether the possible prejudice is outweighed by the probative value of the evidence as to the defendant's credibility as a witness." *State v. Roberts*, 943 S.W.2d 403, 408 (Tenn. Crim. App. 1996), *overruled on other grounds by State v. Ralph*, 6 S.W.3d 251 (Tenn. 1999). The courts of this State have repeatedly held that robbery and theft are crimes of dishonesty, "thus lending greater weight to their probative value regarding credibility." *State v. Lamario Sumner*, No. W2005-00122-CCA-R3-CD, 2006 WL 44377, at *5 (Tenn. Crim. App., at Jackson, Jan. 6, 2006) (quoting *State v. Blevins*, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997)), *perm. app. denied* (Tenn. May 30, 2006). On appellate review, the trial court's rulings on the admissibility of prior convictions for impeachment purposes are subject to reversal only for an abuse of discretion. *State v. Thompson*, 36 S.W.3d 102, 110 (Tenn. Crim. App. 2000). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which stands against logic or reasoning that causes an injustice to the complaining party. *Waller*, 118 S.W.3d at 371.

In the present case, the State properly filed written notice before the trial of its intent to question the Defendant about his eleven prior convictions. Before the Defendant testified, a jury-out hearing was held to determine whether the Defendant's prior convictions would be admissible to impeach the Defendant's testimony. The trial court held that the Defendant's credibility was at issue in this case and that some of his prior convictions were admissible as crimes of dishonesty. The trial court also excluded some of the submitted convictions based upon the fact that they were misdemeanors with no relationship to dishonesty.

In the case under submission, the trial court did not abuse its discretion by ruling that the Defendant's prior convictions were admissible. The trial court determined, and we agree, that the Defendant's credibility was at issue. The Defendant denied the accusations against him and presented an alternative theory as to his presence at the scene of the aggravated robbery. As previously stated, theft is considered a crime of dishonesty and therefore highly probative as to the Defendant's credibility. Automobile burglary "involves theft," as the trial court noted, and thus indicates a similar relationship to the Defendant's credibility. *See State v. Tune*, 872 S.W.2d 922, 927 (Tenn. Crim. App.

1993) (holding burglary is probative of credibility because it is a crime involving false dealing and dishonesty. We also agree with the trial court that the Defendant's misdemeanor conviction for criminal impersonation is a crime of dishonesty. Criminal impersonation, by statute, requires a false statement. T.C.A. §39-16-301(a)(2014); *See also*, *State v. Norman Branch*, No. W2013-00964-CCA-R3-CD, 2014 WL 3744322 at *6 (Tenn. Crim. App, at Jackson, July 28, 2014) *perm. app. denied* (Tenn. Dec. 19, 2014). Accordingly, we conclude that the Defendant's prior convictions were highly probative as to the Defendant's credibility, and the probative value of the testimony was not outweighed by the unfair prejudice.

The trial court also considered the similarity of the crimes. Ultimately, it distinguished the aggravated robbery, a "crime of violence," from the Defendant's prior convictions for automobile burglary, a "property crime." It further noted that it would instruct the jury to only consider the convictions for purposes of credibility to mitigate any risk of prejudice. Under all the circumstances, we discern no abuse of discretion by the trial court in concluding that the State could impeach the Defendant with prior crimes of dishonesty. Accordingly, the Defendant is entitled to not relief on this basis.

## B. Cross-Examination of Victim

The Defendant asserts that the trial court erred when it limited his cross-examination of the victim about the suspect's description. The State responds that the trial court properly exercised its discretion in limiting the cross-examination. We agree with the State.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000); *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992). Denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *see Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination that take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This court

will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. *Dishman*, 915 S.W.2d at 463; *see State v. Fowler*, 373 S.W.2d 460, 466 (Tenn. 1963).

The Tennessee Rules of Evidence define the scope of cross-examination. Rule 611(b) says, "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility, except as provided in paragraph (c)(2) of this rule," with paragraph (c)(2) limiting the scope of cross-examination when a party calls an adverse witness. Tenn. R. Evid. 611(b). In addition, Rule 616 states, "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. "A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001).

The right to cross-examine a witness is also limited to questions that are designed to elicit relevant evidence. Tenn. R. Evid. 401, 402 (providing that "evidence which is not relevant is not admissible"); *see Monts v. State*, 379 S.W.2d 34, 40 (Tenn. 1964); *see also State v. Adkisson*, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994); *State v. Rhoden*, 739 S.W.2d 6, 11 (Tenn. Crim. App. 1987); *State v. Braggs*, 604 S.W.2d 883, 886 (Tenn. Crim. App. 1980); *Taylor v. State*, 551 S.W.2d 331, 335 (Tenn. Crim. App. 1976). The term "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In short, evidence is relevant if it tends to prove a material issue. Tenn. R. Evid. 401, *Advisory Comm'n Cmts*. There are further limitations on the relevant evidence that a defendant may elicit during cross-examination of a witness. Tennessee Rule of Evidence 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This court will not disturb the limits that a trial court has placed upon cross-examination unless the trial court has unreasonably restricted the right. *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001).

At trial, the victim described the robber as "not too fat" but as being on "the heavy side." When questioned about his statement to police following the robbery, that the robber was "black, fat build, kind of tall in dark clothing," the victim stated that he did not remember his exact statement but, after reviewing the statement, the victim recalled making that statement to police. Next, defense counsel asked if the victim was also asked to describe in detail what happened just before, during, and just after this robbery occurred. The State objected, and the trial court sustained the objection, finding that the defense had not established a prior inconsistent statement as a basis for the admission of

the victim's other prior statements. Defense Counsel asked no further questions of the witness. On direct examination, the Defendant testified that he weighed 170 pounds at the time of the robbery.

After review, we do not conclude that the trial court unreasonably restricted the Defendant's right to cross-examination. The jury heard the victim describe the robber as "not too fat" and "on the heavy side" as well as the victim's affirmation that he described the robber three days after the offense as having a "fat build." The jury could then determine whether the discrepancy was significant and the victim's credibility in light of the discrepancy. We agree that a victim is generally a crucial witness for the State and evidence that would lead a jury to question a victim's credibility is significant. The Defendant, however, does not clearly identify what specific inconsistencies he sought to explore in front of the jury or how the trial court's ruling prohibited him from such. In the record, defense counsel offered no argument in support of his line of questioning and there was no offer of proof for this court to review. Likewise, in the Defendant's brief there is no identification of what inconsistencies there were with which to impeach the victim. Therefore, based upon our review of the record before us, we find that the trial court did not abuse its discretion. The Defendant is not entitled to relief.

### C. Sufficiency of the Evidence

The Defendant claims that the verdict is against the weight of the evidence. He argues that the victim's testimony as the sole eyewitness against the Defendant is insufficient in light of the Defendant's testimony that he was present but unaware and totally uninvolved in the robbery. The State responds that sufficient evidence was presented to support the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v.*

*Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

A conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and that the robbery was "accomplished with a deadly weapon or by display of any article used or

fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401(a), -402(a)(1) (2014).

The evidence presented at trial, viewed in the light most favorable to the State, showed that the victim exited his vehicle and that the Defendant addressed him while he was walking toward his apartment. When the victim turned to respond, the Defendant brandished a weapon and demanded the victim's personal items, which included Mexican currency. The Defendant then got into the co-defendant's Avalanche and left the area. Three days later, the victim identified the Defendant in a photographic lineup as the robber. At the time of the Defendant's apprehension, police officers found Mexican currency on his person. The Defendant admitted to being in the back seat of the Avalanche when driving to the apartment complex where the robbery occurred and leaving the apartment complex. The gun used in the robbery was later found in the back seat of the Avalanche. The Defendant admitted his presence but explained that he was unaware of and uninvolved in the robbery. The jury, by its verdict, accredited the victim's testimony. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The Defendant is not entitled to relief.

### D. Sentence

The Defendant contends that the trial court erred when it sentenced him to more than eight years, the minimum for his applicable range. He alleges that the trial court misapplied an enhancement factor dealing with hate crimes and, therefore, improperly increased his sentence. The State responds that, regardless of the misapplication of a factor, the trial court did not abuse its discretion in ordering within range sentence. We agree with the State.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court

should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

The Defendant was convicted of a Class B felony as a Range I, standard offender with a sentencing range of eight to twelve years. The trial court applied two enhancement factors: enhancement factor (1), the Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and enhancement factor (17), the Defendant "intentionally selected the person against whom the crime was committed or selected the property that was damaged or otherwise affected by the crime, in whole or in part, because of the defendant's belief or perception regarding the race, religion, color, disability, sexual orientation, national origin, ancestry or gender of that person." T.C.A. § 40-35-114(1) and (17). The trial court gave "great weight" to the Defendant's criminal history and "some weight" to the fact the victim was Hispanic.

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2014); *see also Bise*, 380 S.W .3d at 699 n. 33. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W .3d at

706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

After review of the record, we conclude that the trial court did not abuse its discretion when it sentenced the Defendant. Even were we to agree with the Defendant's contention that the trial court misapplied enhancement factor (17), the Defendant would not be entitled to relief. The trial court found applicable enhancement factor (1), not contested by the Defendant, leaving a more than adequate basis for enhancement. Furthermore, as we earlier stated, misapplication of an enhancement or mitigating factor alone does not invalidate the sentence.

Accordingly, we conclude that the trial court clearly stated its reasons for the sentence imposed, and the Defendant's sentence is within the appropriate range. It is apparent that the trial court considered the purposes and principles of the Sentencing Act and did not abuse its discretion. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE